U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 JUN 20 PM 3: 17

CLERK
BY_____AL_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE BLACK SAMSUNG PHONE IN THE POSSESSION OF UNITED STATES BORDER PATROL IN RICHFORD, VERMONT | Case No. 2:25-mj-85 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, David T. Palczewski, being duly sworn, state as follows:

**Introduction and Agent Background**

1. I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a black Samsung cellular phone taken from Jose Ignacio De La Cruz De La Rosa ("DE LA CRUZ") during an immigration inspection on June 14, 2025, in the District of Vermont. The black Samsung cellular phone (the "DE LA CRUZ DEVICE") is more particularly described in Attachment A, which is attached to this affidavit and incorporated herein. The DE LA CRUZ DEVICE is associated with a phone number ending in 3008 (the "NACHO NUMBER"), which was used to facilitate an attempted alien smuggling event between April 9, 2025, and April 11, 2025, by arranging transportation for the smuggled alien inside the United States. Therefore, I submit that there is probable cause to believe that the DE LA CRUZ DEVICE contains evidence of a violation of 8 U.S.C. §§ 1324(a)(1)(A)(i), 1324(a)(1)(A)(v)(I), and 1324(a)(1)(A)(v)(II), bringing, or attempting to bring, an alien to the United States at a place other than a designated port of entry or

1

a place other than as designated by the Secretary of Homeland Security, while knowing that such person was an alien, and conspiring to do and aiding and abetting the same.

2.  Moreover, the DE LA CRUZ DEVICE is currently being held in evidence storage at the Richford Border Patrol Station, which is located at 1668 St. Albans Road in Richford, Vermont, and, based on my training and experience, the DE LA CRUZ DEVICE has been stored in a manner such that the data on it will have remained intact and in the same condition as it was at the time of the DE LA CRUZ DEVICE's seizure. The applied-for warrant would authorize the forensic examination of the DE LA CRUZ DEVICE for the purpose of seizing electronically stored data, particularly described in Attachment B, that would be evidence of the aforementioned federal offenses of human smuggling and illegal entry that the user of the DE LA CRUZ DEVICE engaged in, conspired to commit, or aided and abetted.

3.  I am a Border Patrol Agent - Intelligence (BPA-I) of the United States Border Patrol (USBP), a component of Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). I have been employed as a Border Patrol Agent (BPA) since February 5, 2009. I have been assigned to the Richford, Vermont Station as a BPA for approximately five years and have served as the station's prosecution agent for approximately one year. I have been the station's BPA-I since February 12, 2023. I was previously assigned to the Calais, Maine Border Patrol Station as a BPA for approximately ten years and to the Santa Teresa, New Mexico Border Patrol Station for approximately one year. During my time as a BPA, I have conducted numerous investigations, investigations which include the review of many cellular phones and other devices, law enforcement reports, immigration records, and other information. I have also conducted numerous interviews. Further, I have sworn over 10 affidavits in support of those investigations.

4. I have provided a more detailed explanation of what I have learned through my training and experience as a BPA below.

5. The information contained within this affidavit is based upon my training and experience, my own investigative efforts, and investigation by other law enforcement officers with whom I have spoken or whose reports I have reviewed. The following is either known to me personally or has been related to me by persons having direct knowledge of the events described below. The information in this affidavit is meant to set forth probable cause to believe that evidence of the aforementioned federal offenses will be found on the DE LA CRUZ DEVICE. This information does not necessarily include every fact known to law enforcement about the events described below. Unless otherwise specified, the statements described in the following paragraphs are related in sum and substance and are not meant to be direct quotations or complete descriptions.

## Probable Cause

### Prior Border Events and the NACHO NUMBER

6. On April 19, 2025, Border Patrol Agents encountered Yoselin Gonzalez Flores ("GONZALEZ"), a Mexican citizen, during an alien smuggling event in Richford, Vermont. She had just illegally entered the United States. GONZALEZ waived her *Miranda* rights and provided BPAs consent to search the contents of her cellular phone (the "GONZALEZ DEVICE"). GONZALEZ admitted that she had been living in Canada, that she had left Montreal, Canada, on the night of April 18, 2025, that she had entered the United States through the woods and on foot without first seeking permission to enter, that she paid someone in Canada to be smuggled into the United States, and that she expected to pay a driver more money once she was picked up in the United States. Three days later, on April 22, 2025, GONZALEZ pleaded guilty in federal court to

3

one count of illegal entry, in violation of 8 U.S.C. § 1325. She has subsequently been removed from the United States.

7. On the GONZALEZ DEVICE, BPAs saw that GONZALEZ communicated with a contact labeled as "Armando" as well as the phone number later identified as the NACHO NUMBER about a previous attempt to enter the United States. These conversations, which occurred between April 9, 2025, and April 11, 2025, were in Spanish, and the messages appeared in the WhatsApp application, a messaging application offering end-to-end encryption.

8. On or about April 9, 2025, at approximately 5:37 PM, Armando informed GONZALEZ that Armando was going to meet with someone he referred to as "Nacho" to give Nacho his money. Approximately twenty minutes later, Armando told GONZALEZ to tell him when she departed for Toronto. Then, at approximately 6:50 PM, Armando said that he had talked to Nacho and paid for GONZALEZ's trip. Armando also said that Nacho would pick GONZALEZ up as soon as she was in the United States. A little less than an hour later, at approximately 7:41 PM, GONZALEZ asked Armando how much he was charged in total. Armando replied that he paid approximately $5,000. Later that evening, GONZALEZ told Armando that the money situation was a mess.

9. The next morning, on April 10, 2025, at approximately 6:27 AM, Armando sent the NACHO NUMBER to GONZALEZ and told her that when she crosses, Nacho will already be waiting for her.

10. Three minutes later, at approximately 6:30 AM, GONZALEZ messaged the NACHO NUMBER and identified herself as Yoselin and the person that Nacho was going to pick up. GONZALEZ also said that they will cross around 11 PM and arrive around 12 AM on the other side, arriving at a parking lot. The NACHO NUMBER responded to GONZALEZ by saying that

4

he would contact the person smuggling GONZALEZ across the border for the location to pick her up. The NACHO NUMBER then sent GONZALEZ a Google Maps location pin for a Mobile Gas Station in Saratoga Springs, New York, and told GONZALEZ that he was waiting for her there. After forwarding the pin drop, GONZALEZ asked the NACHO NUMBER if the payment on that side would be in cash or money transfer, and the NACHO NUMBER replied by telling GONZALEZ that the payment would be in cash and that he would pay the money.

11. From my training and experience, I know that smuggled aliens often make a series of payments during their crossing. A first payment is often made on the Canadian side of the border, before crossing, and a second payment is often made on the American side of the border, after alien has successfully crossed.

12. Also on April 10, 2025, at approximately 10:33 AM, GONZALEZ told Armando that Nacho was going to talk to someone. Armando then instructed GONZALEZ to tell Nacho about GONZALEZ's situation and to do what Nacho tells her to do. Later, at approximately 5:42 PM, Armando told GONZALEZ that Nacho would pick her up and bring her to his house in Burlington. Armando also indicated that he would pick GONZALEZ up in the afternoon.

13. However, on April 11, 2025, at 3:44 AM, GONZALEZ told the NACHO NUMBER that they would not be crossing. The NACHO NUMBER asked for GONZALEZ's current location, and GONZALEZ responded that she was going to Montreal and would cross through the woods. At approximately 10:26 AM, the NACHO NUMBER told GONZALEZ not to worry and that we're doing everything make sure that they're ok. The NACHO NUMBER also indicated that GONZALEZ would only go to Montreal that day but would cross or pass on foot in the morning. GONZALEZ thanked the NACHO NUMBER and said that she would stay in touch.

14. BPAs investigated the NACHO NUMBER through public records, including Lexus Nexus, using Customs and Border Protection systems. These records showed that the associated owner of the phone number was "Jose Ignacio De La Cruz." An additional search revealed that an address in Milton, Vermont was associated with the NACHO NUMBER.

15. From my training and experience, I know that the name "Nacho" is a common nickname for someone with the Spanish name "Ignacio." After DE LA CRUZ's encounter with Border Patrol on June 14, 2025, I would learn that DE LA CRUZ and "Jose Ignacio De La Cruz" of Milton, Vermont, are the same person. I would also learn that DE LA CRUZ goes by "Nacho."

### Encounter with DE LA CRUZ on June 14, 2025

16. On June 14, 2025, Border Patrol Agent (BPA) Brandon Parent was on duty operating his marked Border Patrol Service vehicle in the area of Richford, Vermont. At approximately 12:00 PM, BPA Parent parked his service vehicle at a pull-out located on Pinnacle Road near the intersection of Drew Road in Richford, Vermont.

17. The intersection of Drew Road and Pinnacle Road is approximately 0.8 miles from the international border between the United States and Canada. Pinnacle Road continues northwest where it terminates at the Pinnacle Port of Entry near the international border. From the intersection of Drew Road and Pinnacle Road, Drew Road leads northeast towards where it terminates near the international border with Canada and a local farm, known as the Hurtubise Farm. There is no designated crossing to legally enter the United States at the end of Drew Road, however. The area is depicted below.



18. The areas surrounding Drew Road and the Hurtubise Farm are rural with only a small number of farms and residences. The terrain features around Drew Road include wooded areas, rivers, brooks, and small valleys that are out of sight from vehicles driving on either Pinnacle or Drew Road. These features make this location favorable for avoiding detection and smuggling aliens. In fact, the area around Drew Road has been used in the past as a location for aliens to illegally cross into the United States, who then wait for a vehicle to pick them up and transport them in furtherance of their illegally entry. During one of these previous events, an alien smuggler used a large passenger van to pick up migrants after they had illegally entered the United States.

19. Normal traffic in this area is light even during rush hour, when traffic typically consists of area residents returning home from work. BPA Parent often patrols the border in this area and has become familiar with the vehicles used by its residents.

20. At approximately 12:02 PM, BPA Parent observed a gray Ford Transit van with Vermont license plate KRP331 traveling south on Drew Road, *i.e.*, away from the international border and towards the intersection with Pinnacle Road. BPA Parent did not recognize this vehicle as belonging to any resident on Drew Road. Nor had BPA Parent previously seen any gray Ford Transit van traveling on Drew Road. The gray Ford Transit van did not have any markings to identify it as belonging to a business or to signal that it was actively being used for work.

21. Based on his knowledge of previous smuggling events near Drew Road, to include an event with a large passenger van, BPA Parent took a closer look at the gray Ford Transit van's occupants. From approximately twenty-five feet away, BPA Parent observed both the driver's and passenger's eyes widen and dart from him back onto the roadway. Their bodies became stiff and rigid. Both individuals sat up in their seats and the driver's arms and hands appeared clenched and rigid on the steering wheel. BPA Parent recognized that such behaviors are often seen in subjects engaged in suspicious behavior upon noticing law enforcement.

22. BPA Parent also saw that the gray Ford Transit van did not make a complete stop at the end of Drew Road which, in his experience, was not consistent with normal local traffic behavior. Local traffic normally comes to a full stop when exiting Drew Road and proceeding onto Pinnacle Road because the visibility around that intersection is poor. Especially during the summer months, the vegetation along the road makes it very difficult to spot oncoming traffic while trying to turn onto Pinnacle Road, something BPA Parent knew from personal experience.

23. As the gray Ford Transit van merged onto Pinnacle Road and began traveling south towards River Road in Richford, Vermont, the occupants of the vehicle did not acknowledge the presence of BPA Parent, who was still inside his marked vehicle. The residents on Drew Road are generally friendly and supportive of BPAs and will typically acknowledge agents with a smile, head nod, or a wave. These individuals did not.

24. BPA Parent viewed the behavior of the occupants of the gray Ford Transit van to mean that the driver of the vehicle wanted to quickly leave the area immediately after observing a marked Border Patrol service vehicle.

25. As the gray Ford Transit van passed BPA Parent's location, he observed the occupants' clothing. Both the driver and there passenger were wearing plain clothing which did not coincide with what local farm workers would wear. BPA Parent therefore believed that the driver and the passenger were not actively working on a farm.

26. After letting between thirty seconds and a minute pass, BPA Parent pulled out and followed the gray Ford Transit van into the town of Richford, Vermont. Upon noticing that BPA Parent was behind it, the van reduced its speed. BPA Parent could see the passenger turn to look through the van's rear window to see if BPA Parent was following. BPA Parent also saw the driver use the side rearview mirror to see if BPA Parent was following. Around this time, BPA Parent observed, through the vans tinted windows, what he thought was additional individuals in the back of the van.

27. As the vehicle approached the intersection of River Street and Main Street in Richford, Vermont, the gray Ford Transit van came to a complete stop, unlike its approach to the Drew Road and Pinnacle Road intersection where the gray Ford Transit van had not stopped.

28. The gray Ford Transit van then turned right on Main Street in Richford, Vermont, away from the border area. Typically, after alien smugglers have picked up aliens, they will take the fasted egress route of the area. One such route—specifically, Route 105, which leads west towards Saint Albans, Vermont, where alien smugglers can enter onto Interstate I-89 south towards larger cities such as New York City, New York and Boston, Massachusetts—was in the direction that the gray Ford Transit van travelled.

29. BPA Parent contacted Swanton Sector Dispatch using his vehicle service radio and requested a registration check on the Vermont license plate KRP331, which was attached to the gray Ford Transit van. Swanton Sector Dispatch returned the registration results to BPA Parent using the service radio. The registration returned to a 2016 gray Ford Transit van registered to Jose De La Cruz De La Rosa, who was born in 1995, out of Milton, Vermont. Milton is about an hour away from where BPA Parent first saw the van on Drew Road.

30. BPA Parent knew that alien smugglers were possibly using vehicles with Vermont license plates to blend in with the local population. Richford BPAs have previously encountered vehicles with Vermont license plates involved in alien smuggling, and he had been told that these license plates are often registered in Vermont cities with larger populations and which are located south of Richford, such as Milton, Colchester, Burlington, and Winooski.

31. At approximately 12:07 PM, BPA Parent initiated a vehicle stop on the gray Ford Transit van as it passed the Stewarts convenience store on Route 105 in Richford, Vermont, and notified Swanton Sector Dispatch and other BPAs regarding this vehicle stop.

32. BPA Parent approached the gray Ford Transit van and observed the driver and a passenger in the front seat. BPA Parent took a closer look in the rear seats and could not see any additional subjects.

33. BPA Parent approached the driver side windows where the driver had rolled the window down approximately three to four inches. The partially open window made it difficult for BPA Parent to communicate with the vehicle's occupants. BPA Parent asked the driver, later identified as DE LA CRUZ, to roll the window down further. DE LA CRUZ refused to do so.

34. BPA Parent began speaking with DE LA CRUZ in English, which DE LA CRUZ appeared to understand, as BPA Parent heard DE LA CRUZ speaking English when he first asked DE LA CRUZ to open the window further. BPA Parent identified himself as a Border Patrol Agent and asked DE LA CRUZ for his driver license.

35. DE LA CRUZ then asked if BPA Parent if he spoke Spanish. BPA Parent said that he spoke only a little Spanish and asked DE LA CRUZ in Spanish for his driver's license. DE LA CRUZ refused to provide his license.

36. BPA Parent then asked DE LA CRUZ of what country he was a citizen and if he had immigration documents to be in the United States. DE LA CRUZ began to speak rapidly and in a low voice, to the point that BPA Parent could not understand DE LA CRUZ. BPA Parent told DE LA CRUZ that BPA Parent could not understand DE LA CRUZ with the window only rolled down a few inches. BPA Parent also asked DE LA CRUZ to slow down his speech, which DE LA CRUZ did not do. BPA Parent understood these behaviors to be evasive. BPA Parent told DE LA CRUZ that other BPAs would soon arrive to help with communication, and DE LA CRUZ took the DE LA CRUZ DEVICE in his hand and said that he was going to call someone.

37. Supervisory BPA (SBPA) Thomas Blaser and BPA William Haffley then arrived on scene to assist BPA Parent. SBPA Blaser and BPA Haffley also attempted to speak to DE LA CRUZ to gain information and conduct an immigration inspection of the vehicle's occupants.

38. DE LA CRUZ and the passenger continued attempting to call others on their cell phones and continued to refuse to effectively communicate with the BPAs. DE LA CRUZ was holding the DE LA CRUZ DEVICE in his hand. All attempts to gain identification, to include the occupants' names and date of birth failed, as they refused to identify themselves. DE LA CRUZ and the passenger said various things in Spanish, including that they were exercising their rights and wanted to speak to a lawyer.

39. BPA Parent returned to his service vehicle to request immigration, criminal history, and warrant checks on the registered owner of the vehicle.

40. SBPA Blaser and BPA Haffley remained at the gray Ford Transit van and ordered DE LA CRUZ to step out of the vehicle. DE LA CRUZ refused to exit his vehicle. DE LA CRUZ and the passenger were warned that they would be removed from the vehicle if they did not comply.

41. After DE LA CRUZ refused to exit his vehicle after being told to do so by BPAs, SBPA Blaser used his duty issued baton to break the driver side window to open the door and remove DE LA CRUZ from the vehicle. SBPA Blaser broke the window at approximately 12:19 PM.

42. After breaking the window, SBPA Blaser opened the driver side door from the inside, and DE LA CRUZ was assisted out of the vehicle. After exiting the vehicle, DE LA CRUZ continued to refuse to answer any questions from BPAs.

43. The passenger, still inside the vehicle, continued to refuse to answer questions from BPAs. The passenger door was opened, and the passenger was assisted out of the vehicle.

44. The passenger refused to speak to agents upon being removed from the van. BPA Parent observed DE LA CRUZ shaking his head at the passenger as a signal for her to not answer

12

any questions. Both the DE LA CRUZ and the passenger were placed in handcuffs, patted down for weapons, and placed in the back of marked Border Patrol vehicles.

45. Swanton Sector Dispatch advised BPA Parent that the registered owner of the vehicle had an encounter at a Border Patrol checkpoint in Del Rio Texas in 2022. The details of the event were limited due to COVID-19 procedures to immediately remove subjects who had illegally entered the United States back to the country they entered from with limited human interaction.

46. Both subjects were transported to the Richford Border Patrol Station for further processing and identification. DE LA CRUZ had in his possession a Vermont driver's license bearing the name "JOSE I DELACRUZDELAROSA" with an address in Milton, Vermont. The address associated with DE LA CRUZ's driver's license is the same as that which was associated with the NACHO NUMBER. His birthday also matched that of the gray Ford Transit van's registered owner.

47. Later that day, I learned in an e-mail that BPAs of the Richford Border Patrol Station had apprehended two subjects during a traffic stop with a vehicle registered to a "JOSE I DELACRUZDELAROSA" out of Milton, Vermont. I recognized the name and city-state combination after investigating the NACHO NUMBER during the investigation of the smuggling event involving GONZALEZ on April 19, 2025.

48. I advised agents that the subject is a possible match to the associated user of the telephone number GONZALEZ was communicating with between April 9, 2025, and April 11, 2025. Consequently, BPAs seized the DE LA CRUZ DEVICE from DE LA CRUZ.

49. On June 16, 2025, I used my government issued cell phone to call the NACHO NUMBER to see if the DE LA CRUZ DEVICE was assigned that number. After dialing the

13

NACHO NUMBER, I observed the DE LA CRUZ DEVICE ring with a call from the phone number assigned to my government issued cell phone.

50. On June 17, 2025, I learned from open-source reporting that DE LA CRUZ goes by the name "Nacho."

## Training and Experience

51. Based on my training and experience as BPA and BPA-I, I know that people who facilitate, and participate in, illegal border crossings into the United States use electronic devices such as cellular phones to facilitate their activities in multiple ways.

    a. For example, participants use cellular phones and other communications devices to plan cross-border smuggling events. This planning includes, among other things: connecting potential aliens with potential smugglers; identifying where an alien will be dropped-off to begin the crossing; discussing whether a crossing will be on foot or in a vehicle; identifying where an alien will be picked up upon making it across the international border; coordinating drop off and pick up times for smuggled aliens; providing the routes that an alien might use to surreptitiously cross the international border; and discussing how much a smuggler might be paid for their efforts. These planning efforts can occur through text and media messages, phone calls, videos, and sharing location information. Cellular phones also facilitate planning cross-border smuggling events by storing contact information, such as names, phone numbers, email addresses, and other identifying information, of those individuals who are able to arrange and execute these events.

    b. Likewise, participants will use cellular phones to coordinate a smuggling event once it actually begins. Among other forms, this coordination can take the form of text messages, media messages, and phone calls, all of which update participants about the

event's progress; location sharing, which allows participants to track aliens' progress as they transit across the border; and photographs and videos, which smugglers take and share to prove that they have moved the aliens in accordance with a trip's plan. Indeed, real-time coordination through location sharing, messaging, and phone calls is particularly necessary in the Richford Station Area of Responsibility because the area's rural nature makes it difficult to arrange meetings at precise times and locations on printed maps.

c. Participants will also use cellular phones to organize and make payments. Payments can flow in many directions, including from the smuggled aliens to a driver or foot guide; from a smuggled alien's family member to a facilitator or trip organizer; from a trip organizer to those driving and guiding the smuggled aliens; and among other participants as they exchange services and materials. The payments also often happen in stages, with one payment happening before an alien crosses the border and a second payment happening after a successful crossing. Other payments are sometimes made to other facilitators as well, such as a driver who agrees to pick up the smuggled alien and deliver the alien to a final destination in the United States. Moreover, these payments are often made via financial applications on cellular phones and are discussed in messages among participants. Relatedly, smugglers often take and send photographs and videos of aliens to family members, facilitators, and other individuals before receiving payment for their service and as proof a completed job.

52. I also know from training and experience that participants in alien smuggling events value some of the information contained on their cellular phones. For example, route information, sometimes stored as location pins in a map application, has both been sold by some smuggling organizations and protected as a sort of trade secret by others. Likewise, contact information helps

aliens, facilitators, and other participants in alien smuggling events coordinate their endeavors. Such information is, therefore, often kept on cellular devices for extended periods of time despite the possible risk of discovery.

**Information Regarding Electronic Storage and Forensic Analysis**

53. Based on my knowledge, training, and experience, I know that electronic devices such as the DE LA CRUZ DEVICE can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices. This information can sometimes be recovered with forensics tools.

54. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant but also forensic evidence that establishes how the DE LA CRUZ DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DE LA CRUZ DEVICE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

55. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DE LA CRUZ DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

**Conclusion and Request**

1. Based on the foregoing, I submit there is probable cause to believe that between April 9, 2025, and April 11, 2025, Jose Ignacio De La Cruz De La Rosa violated 8 U.S.C. §§ 1324(a)(1)(A)(i), 1324(a)(1)(A)(v)(I), and 1324(a)(1)(A)(v)(II), by bringing, or attempting to bring, an alien to the United States at a place other than a designated port of entry or a place other than as designated by the Secretary of Homeland Security, while knowing that such person was an alien, and conspiring to do and aiding and abetting the same.

2. Further, there is probable cause to believe that evidence of those violations will be located inside the DE LA CRUZ DEVICE. I respectfully request the issuance of a search warrant authorizing the examination of the DE LA CRUZ DEVICE, further described in Attachment A, and the seizure therefrom of the data and information described in Attachment B.

3. Because this warrant seeks only permission to examine the DE LA CRUZ DEVICE, which is already in law enforcement's possession, the execution of this warrant would not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 20th day of June, 2025.

DAVID T. PALCZEWSKI
Border Patrol Agent
U.S. Border Patrol

Attested and sworn to before me by reliable electronic means on this 20th day of June, 2025.

HON. KEVIN J. DOYLE
United States Magistrate Judge